John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, LLC**
280 S. Beverly Drive-Penthouse Suite
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: jnelson@milberg.com

***Counsel for Plaintiff and the Proposed Class***

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated, | Case No. 3:25-cv-6433 |
| Plaintiff, | Jury Demand |
| v. | Class Action |
| TEA DATING ADVICE, INC., | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Jane Doe ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, brings this Class Action Complaint against Defendant Tea Dating Advice Inc., ("Tea" or "Defendant"). and alleges, upon personal knowledge as to her own actions and her counsel's investigations, and upon information and belief as to all other matters, as follows

### INTRODUCTION

1.     This case arises from one of the most catastrophic and ironic data

breaches in the digital age—a "safety" app designed to protect women exposed their most sensitive personal information to the darkest corners of the internet. Defendant, which marketed itself as a sanctuary where women could anonymously warn each other about dangerous men, instead became the very threat it promised to protect against.

2.      On July 25, 2025, the unthinkable happened. 72,000 images—including government-issued IDs—sat completely exposed on the internet, accessible to anyone with a web browser.[1] (the "Data Breach").  This was not an elaborate hack. Tea stored its most sensitive user data in a Google Firebase storage bucket configured for completely public access. Anyone who wanted could simply click and download the most sensitive personal information of women who trusted Tea with their safety.

3.      Unlike a typical breach, this Data Breach was discovered not by Tea's security team, nor even by ethical hackers, but by anonymous users on 4chan—the notorious imageboard known for harassment campaigns against women.[2]

4.      Within hours, these users had created automated scripts to systematically download every image. Indeed, some users even complained that they were not able to download the photos fast enough:[3]

---

[1] Zack Whittaker, *Women's Safety App Tea Breached*, Exposing 72,000 User Images, TechCrunch (July 26, 2025), https://techcrunch.com/2025/07/26/dating-safety-app-tea-breached-exposing 72000-user-images/; *see also* Joseph Cox, *Women Dating Safety App 'Tea' Breached, Users' IDs Posted to 4chan*, 404 Media (July 25, 2025), https://www.404media.co/women-dating-safety-app-tea-breached-users-ids-posted-to-4chan/.

[2] *See* Caitlin Dewey, *The Only Guide to 4chan You'll Ever Need,* Wash. Post (May 25, 2014), https://www.washingtonpost.com/news/theintersect/wp/2014/05/25/the-only-guide-to-4chan-youll-ever-need/.

[3] Will McCurdy, *4chan Posts Sensitive Data From Women-Only Dating Safety App*, https://www.pcmag.com/news/women-only-dating-safety-app-tea-hit-by-major-4chan-hack, (July 27, 2025).

CLASS ACTION COMPLAINT

5.      For Plaintiff Jane Doe and tens of thousands of women like her, the nightmare was just beginning. Users quickly created an interactive google maps link that overlaid pins onto a map of the United States, showing the location of "roasties"—the women who had their photos leaked: [4]



---

[4] "Roastie" is a slang term that primarily refers to a woman who is perceived as having a promiscuous lifestyle, often in relation to having multiple sexual partners. The term is often used derogatorily to imply that such a woman is undesirable or has lost value in the dating market due to her perceived sexual history. *See* https://goong.com/word/roastie_meaning/.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CLASS ACTION COMPLAINT

6.    The fallout continued to get worse. Users of 4chan created a "ELO-ranking system"—a method for calculating the relative skill levels of players in various competitive games, such as chess— to rank the "foids,"[5] randomly pitting two random leaked women's photos against each other and assigning points to the woman whose photo was rated higher.[6] This ELO ranking system even has a "Top 50" and "Bottom 50" leaderboard:



7.    Instead of protecting women like Jane Doe, Tea's shocking security failures handed their identities to the very predators they sought to avoid. The exposed data created a perfect kit for identity theft: high-resolution government IDs showing full names and addresses and selfies, many including EXIF location information, among other sensitive and private information. For women who used Tea to report dangerous men, the breach didn't just compromise their financial security—it potentially exposed them to physical danger from the very people they

---

[5] "Foid" is a slang abbreviation for "female humanoid." The term is often used in online communities, particularly within certain subsets of the alt-right and incel (involuntarily celibate) communities. Generally, it denotes a cold or detached view of women, reducing them to a mere biological category and often used in a derogatory context. *See* https://www.slangsphere.com/foid-meaning-slang-understanding-its-significance-in-modern-vernacular/.

[6] https://teaspill.fun/leaderboard.php.

were warning others about – now with maps of Tea users floating around the darker corners of the web.  There is also public online humiliation of the sexist, sexual, and violent kind, and the potential for deepfakes.[7]

8.     Notwithstanding Defendant's myriad failures, it represents that it takes cybersecurity seriously and that it implements reasonable technical, administrative, and physical controls:

> **Security of Your Personal Information**
> The security of your Personal Information is important to us. When you enter sensitive information (such as credit card number) on our Services, we encrypt that information using secure socket layer technology (SSL).Tea Dating Advice takes reasonable security measures to protect your Personal Information to prevent loss, misuse, unauthorized access, disclosure, alteration, and destruction.
>
> ***
>
> **Use of Personal Information We Collect**
>
> During the registration process, users are required to submit a selfie photo for verification purposes. This photo is securely processed and stored only temporarily and will be deleted immediately following the completion of the verification process.[8]

9.     Defendant reassured the women that used its app that it deleted these verification selfies. This was simply false. Defendant posted an official statement regarding the Data Breach, stating in relevant part:

---

[7] *See* Karen Hao, *Deepfake Porn Is Ruining Women's Lives. Now the Law May Finally Ban It,* MIT Tech. Rev. (Feb. 12, 2021), https://www.technologyreview.com/2021/02/12/1018222/deepfake-revenge-porn-coming-ban/.

[8] Tea's Privacy Policy, https://www.teaforwomen.com/privacy.

**I thought the selfies were deleted?**
This data was originally archived in compliance with law enforcement
requirements related to cyber-bullying prevention.[9]

10.    Tea promised Jane Doe and millions of women anonymity.[10] It
promised to delete verification data. It promised safety. Tea broke every one of those
promises. In an age where data breaches have become commonplace, this case is
striking: an anonymity platform that exposed names, photos, and locations; a safety
app that made its users less safe; a tool meant to allow women to protect themselves
that instead handed their personal information to anyone passing by.

11.    The nightmare continued. Tea reassured the victims that the dataset was
limited to "a legacy data storage system [that] was compromised, resulting in
unauthorized access to a dataset from prior to February 2024," and that "[n]o email
addresses or phone numbers were accessed. Only users who signed up before
February 2024 were affected."[11]

12.    This was false—images were not the only data compromised in the
breach. On or about July 28, 2025, Tea announced that "as part of our ongoing
investigation, we have recently learned that some direct messages (DMs) were
accessed as part of the initial incident. For this reason our DM functionality is
down."

13.    False too, was the statement that the DMs that were simply part of the
initial incident. According to news reports, Tea exposed much more user data than
what was first with an independent security researcher now finding it was possible
for hackers to access messages between users "discussing abortions, cheating
partners, and phone numbers they sent to one another," with "messages from ***early***

---

[9] https://www.teaforwomen.com/cyberincident.
[10] As of July 25, 2025—the day that Tea discovered the Data Breach—Tea's social
media boasted that they "officially have over 4 million women in our community."
*See* https://www.instagram.com/p/DMf7zkeJi6U/?img_index=1.
[11] https://www.teaforwomen.com/cyberincident.

*2023 until up to last week,* with more than *1.1 million messages recorded.*"[12]

14.    In the wake of this comedy of cybersecurity errors by Defendant, Plaintiff brings this action individually and on behalf of all Tea users whose personal information was exposed in the breach, seeking damages, restitution, and injunctive relief to prevent such a betrayal from ever happening again.

## PARTIES

15.    Plaintiff Jane Doe is a resident and citizen of Kentucky. To protect her safety and privacy—ironically, the very things Defendant Tea promised but failed to provide—Plaintiff proceeds under a pseudonym. Given the nature of this breach and the sensitive information exposed, Plaintiff has a substantial privacy interest that outweighs the public's interest in knowing her identity.

16.    Plaintiff was required to provide, and did provide, her sensitive PII to Defendant Tea in order to use the Tea app. As a result of the Data Breach, Plaintiff's PII was exposed to unauthorized third parties.

17.    Defendant Tea Dating Advice, Inc. is a Delaware corporation doing business as "Tea" or "Tea App," with its principal place of business at 201 Spear St., Suite 1100, San Francisco, California 94105.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (a) there are 100 or more members in the proposed class; (b) members of the proposed class—including Plaintiff—have a different citizenship from Defendants; and (c) the claims of the proposed class members exceed the sum or value of

---

[12] Lauren Forristal, *Tea app's second data breach exposed over a million private messages,*https://www.msn.com/en-us/news/technology/tea-app-s-second-data-breach-exposed-over-a-million-private-messages/ar AA1JwvCO?ocid=BingNewsSerp (July 29, 2025) (emphasis added).

$5,000,000, exclusive of interest and costs

19.    This Court has personal jurisdiction because Defendant conducts substantial business in this District, with its principal place of business in this District, and otherwise purposefully avails itself of the markets in California through its business activities.

20.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendants conduct substantial business in this District, market their services to residents of this District, and the data breach affected numerous residents of this District. Additionally, Defendants' negligent data security practices and failure to prevent dissemination of stolen data had direct and foreseeable effects in this District.

### ADDITIONAL FACTUAL ALLEGATIONS

21.    Tea – "the first-ever dating safety platform for women" – is an app that provides a suite of dating screening services to women, based on information about men obtained through crowdsourcing from the app's users and public records.[13]

22.    Tea advertises that its services enable users to "find verified green flag men," "run background checks," and "identify potential catfish."[14]

23.    The app's exclusive nature—only verified women could join—added to its appeal. To join Tea's exclusive community, women had to pass through a stringent identity verification process. This was not a simple email confirmation or phone number verification. Tea demanded government-issued photo identification—driver's licenses, passports, state IDs—along with other sensitive and private information.

24.    Defendant made promises and representations to Plaintiff and Class

---

[13] https://www.teaforwomen.com/about
[14] *Id.*

Members that their PII would be kept safe and confidential, and that the privacy of that information would be maintained.

25.    Plaintiff's and Class Members' PII was provided to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

26.    Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep consumer's PII safe and confidential.

27.    Defendant had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA"), industry standards, and representations made to Plaintiff and Class Members, to keep his PII confidential and to protect it from unauthorized access and disclosure.

28.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

**Defendant's Data Breach Was Imminently Foreseeable**

29.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the Data Breach.

30.    Data thieves regularly target institutions like Defendant due to the highly sensitive information in its custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

31.    In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from

2020.[15]

32.     As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members because of a breach.

33.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

34.     Tea knew exactly what it was collecting. With these images and other sensitive information, criminals could potentially create deepfake videos for fraud or harassment, bypass facial recognition security systems, impersonate victims in video calls with banks or government agencies, build comprehensive profiles for stalking or doxxing, and sell "verified" identities on dark web marketplaces—among a myriad of other harms.[16]

35.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

36.     The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[15] *See* Identity Theft Res. Ctr., *2021 Data Breach Annual Report*, at 6 (Jan. 2022), https://notified.idtheftcenter.org/s/.

[16] *See generally* Rana Ayyub*, I Was The Victim Of A Deepfake Porn Plot Intended To Silence Me*, Huffington Post (Nov. 21, 2018), https://www.huffingtonpost.co.uk/entry/deepfake-porn_uk_5bf2c126e4b0f32bd58ba316.

Tea proceeded to collect this information from numerous women, storing it all in one convenient location—all protected by precisely nothing.

**Value of Personally Identifiable Information**

37.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17]  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[18]

38.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[19]

39.    For example, PII can be sold at a price ranging from $40 to $200.[20] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[21]

40.    This data also fetches a higher price on the black market. Martin Walter,

---

[17] 17 C.F.R. § 248.201 (2013).

[18] *Id.*

[19] Anita George, *Your Personal Data Is for Sale on The Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[20] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.

[21] *In the Dark*, VPNOVERVIEW, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark.

senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[22]

41.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[23]

**Defendant Failed to Comply with FTC Guidelines**

42.     The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

43.     In October 2016, the FTC updated its publication, Protecting Personal

---

[22] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-credit-card-numbers.html.

[23] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand his network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

44.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

45.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet his data security obligations.

46.    As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices, or to appropriately prepare to face a data breach and respond to it in a timely manner. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by

Section 5 of the FTC Act.

47.    Defendant was at all times fully aware of its obligation to protect the PII of consumers under the FTC Act yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**Defendant Failed to Comply with Industry Standards.**

48.    Experts studying cybersecurity routinely identify institutions that store PII like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

49.    Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendant, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, implementing reasonable systems to identify malicious activity, implementing reasonable governing policies, and limiting which employees can access sensitive data. As evidenced by the Data Breach and its timeline, Defendant failed to follow some or all these industry best practices.

50.    Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points.

51.    Moreover, a properly trained helpdesk that understands how to face social engineering attacks is an expected part of all cybersecurity programs.

52.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR-DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

53.     Defendant failed to comply with ***any*** of these accepted standards, thereby permitting the Data Breach to occur.

54.     Put bluntly, this wasn't a sophisticated attack by nation-state hackers. This wasn't a zero-day vulnerability that no one could have anticipated. Defendant failed at the cybersecurity threshold; failing to implement basic security measures—including bothering to even set a password to protect its customer's PII.

55.     Firebase, Google's cloud platform, is actually a robust and secure service—when configured properly. Storage buckets, in particular, require developers to configure access restrictions.[24] Firebase, Google's cloud platform, is actually a robust and secure service—when configured properly. Storage buckets, in particular, require developers to configure access restrictions.

56.     Tea never cared. It left its Firebase bucket configured for completely public access. No authentication required. No access logs to track who was downloading data. No encryption to protect the files. Just a URL that anyone could access.

57.     Google's documentation is crystal clear about storage bucket security. The Firebase console literally has a section called "Security Rules" with templates

---

[24] *See* Google Cloud, *Security Rules for Cloud Storage*, Firebase Documentation (last visited July 28, 2025), https://firebase.google.com/docs/storage/security.

for common scenarios.[25] Setting proper access controls takes minutes. Tea either never bothered to look or looked and decided user security wasn't worth those minutes.

58.    Tea had no idea their data was being massively exfiltrated until reporters told them. No alerts for unusual access patterns, warnings about large download volumes, logging of who was accessing what.

59.    Even if Tea had some legitimate reason to keep verification data (which they've never adequately explained), why keep it all in one place? Why not encrypt it? Why not segregate it from production systems? Why not implement access controls so only specific employees could view it for specific reasons? The answer appears to be that Tea simply uploaded everything to Firebase and forgot about it.

60.    Fourth, the "vibe coding" problem. Multiple security experts who reviewed the breach concluded that Tea likely used AI-generated code for their Firebase implementation. The telltale signs were all there: functional code that worked but lacked basic security considerations, default configurations left unchanged, no evidence of security review or testing. It's what happens when startups prioritize speed over safety, when they trust ChatGPT more than security professionals.

61.    Perhaps most damning is what Tea did have resources for. While they couldn't spare the time to secure user data, they had plenty of resources for marketing. While they couldn't afford proper security monitoring, they could afford Super Bowl ad campaigns. While they couldn't hire security professionals, they could hire growth hackers. The breach wasn't caused by lack of resources—it was caused by lack of caring.

---

[25] *Id.*

**Common Injuries & Damages**

62.    Because of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; and (c) the continued risk to Plaintiff and Class Member's PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

63.    The Tea breach stands apart for the particularly cruel nature of its harm. This wasn't just data—it was trust. This wasn't just privacy—it was safety. This wasn't just another breach—it was a betrayal that put vulnerable women directly in harm's way.

64.    The psychological harm is equally devastating. Women who trusted Tea with their most sensitive information now live in constant fear. Every unknown phone call could be a stalker who found their number. Every piece of mail could be evidence of identity theft. Every knock on the door could be retaliation for a warning they posted. The safety app has made them perpetually unsafe.

65.    Making matters worse, the data can never be fully contained. While a breached credit card can be cancelled, the images Tea exposed will circulate forever. They're on 4chan archives. They're in torrent files. They're on hard drives around the world. They're in the hands of people who wish these women harm.

**The Data Breach Increases Victims' Risk of Identity Theft.**

66.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

67.    The Standard operating procedure for cybercriminals is to use some data, to access "fullz packages" of that person to gain access to the full suite of additional PII that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.[26]

68.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

69.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a

---

[26] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

**Loss of Time to Mitigate Risk of Identity Theft and Fraud**

70. Because of the recognized risk of identity theft, when a data breach occurs, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

71. The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' government identification are affected.

72. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on her accounts; changing passwords and re-securing her own computer networks; and checking her financial accounts and health insurance statements for any indication of fraudulent activity, which may take years to detect.

73. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to his good name and credit record."[27]

---

[27] *See* U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

**The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

74.    Based on the value of the information leaked in the Data Breach, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

75.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

**Plaintiff's Experience**

76.    Plaintiff Jane Doe downloaded and joined Tea because she wanted to warn other women about her abusive ex-partner. Plaintiff specifically chose Tea because it promised anonymous reporting—the man in questioned threatened Plaintiff Doe and told her to never talk about the abuse she suffered.

77.    In order to use Tea, Plaintiff was required to submit a photo and additional information through the Tea app, which she did, and that photograph and information now have been released through the Data Breach. Plaintiff is afraid the man in question will soon find out that Plaintiff posted about him on the Tea app. Accordingly, Plaintiff is in fear for her safety as a result of this Data Breach.

78.    Plaintiff is careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location.

79.    Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

80.    Moreover, as a result of the Data Breach, Plaintiff is at present risk and

will continue to be at increased risk of identity theft and fraud for years to come.

81.    Plaintiff has suffered additional actual injuries from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

82.    Moreover, the Data Breach represents a serious invasion of Plaintiff's privacy because the disclosure was to the exact group of people from whom the cybersecurity measures are supposed to protect Plaintiff and the Class.

83.    As a result of the Data Breach, Plaintiff will be required to spend considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Indeed, she has already spent several hours researching the breach, reviewing her bank accounts, monitoring her credit report, changing passwords, and other efforts as recommended by experts.

84.    Since the Data Breach, and because of the significant risk of identity theft and fraud, Plaintiff has suffered stress and anxiety.

85.    As a result of the Data Breach, Plaintiff is at present risk and will continue to be at increased risk of identity theft and fraud for years to come that requires years of credit monitoring and identity theft protection.

86.    Plaintiff has a continuing interest in ensuring that her Private

Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

87.    As a direct result of Tea's failures and the subsequent distribution of her data, Plaintiff has suffered and continues to suffer significant harm. She has spent and will spend considerable time and money on protective measures, including identity theft protection. She lives in constant fear that her exposed driver's license will be used for identity theft, that her biometric data will be used to create deepfakes or bypass security systems, or worst of all, that the man she downloaded the Tea will find out she exposed him on the app and seek retaliation. With Tea, anonymity was her only protection. Defendant stole that from her.

## CLASS ALLEGATIONS

88.    Pursuant to the Federal Rules of Civil Procedure 23(b)(1), 23(b)(3), Plaintiff brings this action on behalf of themselves and on behalf of all members of the proposed class defined as:

> All persons residing in the United States whose Personally Identifiable Information ("PII") was exposed in the Tea data breach announced on or about July 25, 2025.

89.    Plaintiff brings this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of herself and the following Subclass (the "Subclass"):

> All persons residing in the United States whose driver's licenses were exposed in the Tea data breach announced on or about July 25, 2025.

90.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol

for opting out; and all judges assigned to hear any aspect of this litigation, as well as his immediate family members.

91.     Plaintiff reserves the right to amend the definition of the proposed Class or to add a subclass before the Court determines whether certification is appropriate.

92.     The proposed Class meets the criteria certification under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3).

93.     <u>Numerosity.</u> The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes the proposed Class is composed of millions of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's records.

94.     <u>Commonality.</u> There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.  Whether Defendant engaged in the conduct alleged herein;

b.  Whether Defendant's conduct violated the FTC Act;

c.  When Defendant learned of the Data Breach;

d.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

e.  Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

f.  Whether Defendant's data security systems, prior to and during the Data Breach, were consistent with industry standards;

g.  Whether Defendant owed duties to Class Members to safeguard his PII;

h.  Whether Defendant breached his duties to Class Members to safeguard his PII;

i.  Whether hackers obtained Class Members' PII via the Data Breach;

j.  Whether Defendant had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

k.  Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

l.  Whether Defendant knew or should have known its data security systems and monitoring processes were deficient;

m. What damages Plaintiff and Class Members suffered as a result of Defendant's misconduct;

n.  Whether Defendant's conduct was negligent;

o.  Whether Defendant breached contracts it had with its clients, which were made expressly for the benefit of Plaintiff and Class Members;

p.  Whether Plaintiff and Class Members are entitled to damages;

q.  Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

r.  Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

95.  <u>Typicality.</u> Plaintiff's claims are typical of those of other Class Members because Plaintiff's PII, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendant. Plaintiff is advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

96.   <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

97.   <u>Predominance.</u> Defendant has engaged in a common course of conduct toward Plaintiff and Class Members. For example, all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

98.   <u>Superiority.</u> A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating his individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

99.   Class certification is also appropriate. Defendant has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

100.   Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.

## CLAIMS FOR RELIEF

### <u>COUNT I</u>
### NEGLIGENCE AND NEGLIGENCE PER SE
### (On Behalf of Plaintiff and the Class)

101.   Plaintiff incorporates the above allegations as if fully set forth herein.

102.   Defendant required Plaintiff and the Class Members to submit highly sensitive, non-public PII to Defendant in order to use the Tea app.

103.   Plaintiff and Class Members provided their non-public PII to Defendant with the understanding that it would adhere to its legal obligations to protect such information.

104.   Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

105.   By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

106.   Defendant had duties to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

107.   Defendant's duty to use reasonable security measures also arose under the common law, and as informed by the FTC Act, which mandates that Defendant implement reasonable cybersecurity measures.

108.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

109.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

110.    Defendant had and continues to have duties to adequately disclose that the PII of Plaintiff and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

111.    Defendant breached its duties, pursuant to the FTC Act, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b.  Failing to adequately monitor the security of its networks and systems, including by failing to implement reasonable monitoring, logging, and alerting systems such as EDR/XDR, data loss prevention tools, and a centralized security event management system;

c.  Allowing unauthorized access to Class Members' PII;

d.  Failing to detect in a timely manner that Class Members' PII had been compromised;

e.  Failing to remove Plaintiff's and Class Members' PII it was no longer required to retain pursuant to regulations; and

f.  Failing to implement a reasonable cybersecurity incident response plan that would have enabled Defendant to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so they could take appropriate steps to mitigate the potential for identity theft and other damages.

112.  Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

113.  Defendant's violation of the FTC Act also constitutes negligence *per se*, as those provisions are designed to protect individuals like Plaintiff and the proposed Class Members from the harms associated with data breaches.

114.  Defendant has admitted that the PII of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

115.  But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

116.  There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The PII of Plaintiff and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

117.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of his PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

(iv) loss of benefit of the bargain; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

118.  As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

119.  Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of his PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the PII in its continued possession.

120.  Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

121.  Given Defendant's failures to implement the proper systems, as defined above, even knowing the ubiquity of the threat of data breaches, Defendant's decision not to invest enough resources in its cyber defenses amounts to gross negligence.

1

2

### COUNT II
### BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff and the Class)

3    122.   Plaintiff incorporates the above allegations as if fully set forth herein.

4    123.   Plaintiff and the proposed Class Members transferred their PII to

5    Defendant as a condition of using the Tea App.

6    124.   Plaintiff and Class Members conferred a monetary benefit on

7    Defendant. Specifically, they provided Defendant with their Private Information. In

8    exchange, Defendant should have provided adequate data security for Plaintiff and

9    Class Members and implicitly agreed to do so, including, among other things, though

10   representations made in Defendant's Terms of Use[28] and Privacy Policy.[29]

11   125.   Defendant knew that Plaintiff and Class Members conferred a benefit

12   on it in the form their PII as a necessary part of their employment.

13   126.   Defendant, however, failed to secure Plaintiff and Class Members' PII

14   and, therefore, did not provide adequate data security in return for the benefit

15   Plaintiff and Class Members provided.

16   127.   If Plaintiff and Class Members knew that Defendant had not reasonably

17   secured their PII, they would not have allowed it to be provided to Defendant.

18   128.   As a direct and proximate result of Defendant's conduct, Plaintiff and

19   Class Members have suffered and will suffer injury, including but not limited to: (i)

20   invasion of privacy; (ii) theft of their Private Information; (iii) lost time and

21   opportunity costs associated with attempting to mitigate the actual consequences of

22   the Data Breach; (iv) lost opportunity costs associated with attempting to mitigate

23   the actual consequences of the Data Breach; (v) experiencing an increase in spam

24   calls, texts, and/or emails; (vi) statutory damages; (vii) nominal damages; and (viii)

25   the continued and certainly increased risk to their Private Information, which: (a)

26

[28] https://www.teaforwomen.com/terms.

27   [29] https://www.teaforwomen.com/privacy.

28

remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

**COUNT III**
**INVASION OF PRIVACY/PUBLIC DISCLOSURE OF PRIVATE FACTS**
**(On Behalf of Plaintiff and the Class)**

129.   Plaintiff incorporates the above allegations as if fully set forth herein.

130.   Plaintiff and Class Members took reasonable and appropriate steps to keep their PII confidential from the public.

131.   Plaintiff's and Class Members' efforts to safeguard their own PII were successful, until Defendant failed to protect the same.

132.   Plaintiff and Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

133.   Defendant owed a duty to the individuals for whom it collected PII, including Plaintiff and the proposed Class Members, to keep their PII confidential.

134.   The unauthorized release of PII is highly offensive to any reasonable person.

135.   Plaintiff's and Class Members' PII is not of legitimate concern to the public.

136.   Defendant knew or should have known that Plaintiff's and Class Members' PII was private, as any reasonable person would.

137.   Defendant caused the publicized of Plaintiff's and Class Members' PII by failing to implement reasonable cybersecurity measures while being substantially certain that such a failure would lead to a data breach.

138.    Indeed, such substantial certainty is clear given the ubiquity of data breaches.

139.    Moreover, the disclosure meets the definition of a publication because the disclosure was done to the exact people from whom cybersecurity measures are meant to protect Plaintiff and the Class—such that they are in a special relationship with Plaintiff and the Class.

140.    By intentionally failing to keep Plaintiffs' and Class Members' PII safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendants intentionally invaded Plaintiffs' and Class Members' privacy by:

a.    Intentionally and substantially intruding into Plaintiffs' and Class Members' private affairs in a manner that identifies Plaintiffs and Class Members and that would be highly offensive and objectionable to an ordinary person;

b.    Intentionally publicizing private facts about Plaintiffs and Class Members, which is highly offensive and objectionable to an ordinary person; and

c.    Intentionally causing anguish or suffering to Plaintiffs and Class Members.

141.    As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id.* cmt. B.

142.    Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendants were substantially certain

that their failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiffs' privacy.

143.   Defendants knew that an ordinary person in Plaintiffs' or Class Members' position would consider the exposure of their PII and PHI to be highly offensive and objectionable.

144.   Defendant invaded Plaintiffs' and Class Members' right to privacy and intruded into Plaintiffs' and Class Members' private affairs by intentionally misusing and/or disclosing their PII without their informed, voluntary, affirmative, and clear consent.

145.   Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that Defendant's inadequate data security measures will likely result in additional data breaches. Plaintiff and Class Members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiff's and Class Members' privacy by Defendant.

**<u>COUNT IV</u>**
**Violation Of The California Consumer Records Act**
**Cal. Civ. Code §§ 1798.80, et seq.**
**(On Behalf of Plaintiff and the SubClass)**

146.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

147.   The California Legislature enacted the California Consumer Records Act ("CRA"), Cal. Civ. Code §§ 1798.80, et seq., "to ensure that Personal Information about California residents is protected." Cal. Civ. Code § 1798.81.5(a)(1).

148.   The CRA requires that "[a] business that owns, licenses, or maintains Personal Information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code § 1798.81.5(b).

149.   Defendant maintains computerized data that includes PII, as defined by Cal. Civ. Code § 1798.80. This includes PII about Plaintiff and Class Members that was disclosed in the Data Breach. Cal. Civ. Code § 1798.81.5(d)(1)(A); Cal. Civ. Code § 1798.82.

150.   Pursuant to the CRA, Defendant was required to "notify the owner or licensee of the information of the breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b). The security breach notification must include "the types of Personal Information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

151.   Defendant reasonably believed that Plaintiff's and the California Sub-Class Members' PII was acquired by unauthorized persons during the Data Breach. As such, Defendant had an obligation under the CRA to disclose the Data Breach, immediately following its discovery, to Plaintiffs and California Sub-Class Members as the owners or licensees of the PII. Cal. Civ. Code § 1798.82.

152.   By willfully, intentionally, and/or recklessly failing to disclose the Data Breach immediately following its discovery, Defendant Tea violated Cal. Civ. Code § 1798.82.

153.   As a direct and proximate result of Defendan Teat's violations of the CRA, Plaintiffs and the California Sub-Class sustained actual losses and damages as described herein.

154.    Plaintiff and the California Sub-Class seek damages, injunctive relief, and other and further relief as the Court may deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all Class Members, requests judgment against Defendant and that the Court grant the following:

A.    For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

    iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification

for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v.    prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train his security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.    requiring Defendant to conduct regular database scanning and securing checks;

x.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.   requiring Defendant to implement a system of tests to assess his respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

CLASS ACTION COMPLAINT

xv.   for a period of 7 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of actual damages, compensatory damages, and nominal damages, in an amount to be determined, and for punitive damages, as allowable by law;

E.   For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

F.   Pre- and post-judgment interest on any amounts awarded; and

G.   Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demand a trial by jury on all issues so triable.

Dated: July 31, 2025                    Respectfully submitted,

*/s/John J. Nelson*
John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLC**
280 S. Beverly Drive-Penthouse Suite
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: jnelson@milberg.com

J. Gerard Stranch, IV*
Emily E. Schiller*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
eschiller@stranchlaw.com

***Pro Hac Vice Application Forthcoming
Counsel for Plaintiff and the Proposed
Class***